HAMLIN, Justice.
Defendants appeal from their convictions of Armed Robbery, LSA-R.S. 14:64, and their sentences to serve twenty years at hard labor, without benefit of probation, parole or suspension of sentence, in- the Louisiana State Penitentiary, the sentence as to Clyde W. Anderson to run consecutively with the sentence he was serving at the time the immediate sentence was imposed. Five Bills of Exceptions reserved during the course of the proceedings are presented for our consideration and determination.
The facts herein are to the effect that on Saturday, March 7, 1970, between 11:30 A.M. and 12:00 o’clock noon, Ben P. Ra-gusa, Sr., owner of Ragusa’s Grocery and Market, Myrtle Street, Baton Rouge, Louisiana, suffered a robbery at his business establishment. Two masked men came in while Ragusa was cashing a check for a customer, Worlington Charleston; one man pointed a gun at Ragusa and ordered him to keep his head down. Approximately $1,-300.00 was taken from the cash registers, the counter (money lying on the counter belonged to Charleston, being the proceeds of his check), and Ragusa’s wallet. Through his large front glass door, Ragu-sa witnessed the robbers drive off in a red car. Charleston left the store immediately and was able to follow the get away car for some distance; he secured its license *312 number and communicated it to police officers, who were at the scene of the robbery within fifteen minutes of its occurrence. The vehicle, which had been stolen, was abandoned by the robbers and found by police officers a short time after the commission of the robbery.
A number of persons were present in Ragusa’s store when the robbery took place; they were later questioned by police authorities and shown pictures of police suspects. Defendants were arrested by Officer Aaron G. Johnson, Jr., Baton Rouge City Police Department, Detective Division, on March 11; 1970. A Bill of Information, which charged that Jordan W. Anderson, Jr. and Clyde W. Anderson, on March 7, 1970, did violate LSA-R.S. 14:64, in that they, while armed with a dangerous weapon, robbed Ben P. Ragusa, Sr., was filed in the Nineteenth Judicial District Court on April 24, 1970. After trial by jury, the defendants were found guilty as charged.
BILL OF EXCEPTIONS NO. 1
Bill of Exceptions No. 1 was reserved when the trial court overruled defendants’ objection to the introduction in evidence of a .38 caliber pistol as the weapon used by one of the accused at the time of the instant robbery.[1]
Counsel contended that because of testimony that will be discussed and quoted infra there was not a proper identification of the .38 caliber pistol.
Ragusa testified during trial prior to the introduction of the pistol in evidence; his testimony with respect to the gun is as follows:
“Q. This gun would have been pointed at you — did each of them have a gun that looked like this?
“A. I didn’t pay too much attention to the other gun, the fellow was holding on the other people. The one that I seen the most, closer, was the one that was closer to me, in my way of looking, I think it had a little kind of shiny look. I didn’t say it was exactly that color, but in my mind, it looked kind of like it was shiny. That’s the best that I can give .
“Q. But it didn’t look like it was quite this shiny?
“A. I don’t know. No use in my going any further. I don’t remember. Let’s put it that way. All I know it was a long piece of gun and that’s good enough for me. When the man told me to put your head down and don’t look up, that’s just what I done.
“Q. In answer to Mr. Beckner’s question, though, you said you looked at this gun and you said, well, that’s within the color range, but it didn’t appear to be that shiny?
“A. Not that shiny, that’s right, to me, it wasn’t.
“Q. So if you had to guess, you couldn’t say that this was the gun?
“A. No, sir, I couldn’t. I didn’t state that I could.”
Concerning the .38 caliber pistol, Wor-lington Charleston, the customer for whom Ragusa was cashing the check at the time of the robbery, testified, prior to the introduction of the gun, as follows:
“Q. I ask you to look at this and see if this looks similar or like the one that you saw that day?
*313 “A. The one I glanced at looked like it was a little longer.
“Q. Was it the same color?
“A. No, it was darker.
“Q. Did you see both pistols?
“A. No, sir, I didn’t see both of them.
“Q. You just saw one of them?
“A. Yes, sir.
“Q. And the one you saw was darker?
“A. Yes, sir.”
On cross-examination, Charleston testified as follows:
“Q. You are sure you saw a gun?
“A. Yes, sir, it was a gun.
“Q. If you saw one, it was darker than this and it was bigger than this ?
“A. It looked like it was a little longer, the barrel.
“Q. This couldn’t be the gun ?
“A. Not from what I glanced up and seen.”
Charleston stated that he did not turn around and look at the robber who was behind him. He said, “He was right over my shoulder, yes, sir.”
Officer Raymond Eugene Brashear, Baton Rouge City Police Department, who, at approximately 12:19 P.M., was the first officer to arrive at the scene of the robbery, testified that he secured from the witnesses to the robbery the following description of the suspects:
“Subject Number One had a black hat, stocking over face, had a trench coat, dark pants, black tennis shoes, between 5'8" and 5T0", 180 to 190 pounds, between 21 and 22 years old. Subject Number Two had a brown three-quarter length coat, between 5'6" and 5'7", he was light brown skinned and had an approximately three-quarter inch scar on the jaw, left side, and had a small mustache, between 19 and 20 years old, a brown hat and armed with a possible chrome plated .32 pistol.”
On cross-examination, Brashear was asked, “What kind of weapon is that?” He responded, “This is a .38 special, Smith & Wesson.”
Detective Johnson, who arrested Jordan Anderson on March 11, 1970, looked at the .38 caliber pistol during trial and testified that it was in the possession of Jordan Anderson at the time he arrested him. Johnson also said that from his general observation, Clyde Anderson was the shorter of the two accused.
Melinda Moore, an eleven year old sixth grader at South Boulevard Elementary School, Baton Rouge, Louisiana, testified after the three above witnesses had given their testimony. She said that on March 7, 1970, she entered Ragusa’s store and saw the robbers; she thought that they were playing but found out differently when she walked to the candy stand and saw one of the robbers holding a gun on Mr. Ragusa and heard the robber tell him to lie down. In court, Melinda identified Jordan Anderson as the same man she had identified as Ragusa’s robber at a lineup. She then gave the following testimony:
“Q. Melinda, I want you to look at this and tell me if you have ever seen it before?
“A. Yes.
“Q. Where did you see that gun before?
“A. He had it on Mr. Ragusa.
“Q. You are speaking of the one on the end in the brown jacket?
“A. Yes.
“Q. He had it on Mr. Ragusa?
“A. Yes.”
After the above testimony was given, the .38 caliber pistol was offered in evidence, *314 and the instant bill was reserved. Melinda continued to testify as follows on cross-examination :
“Q. Is this the only time you have ever seen a gun that looked anything like this, Melinda ?
“A. Yes.
“Q. Was there any mark on this gun anywhere ? Did any of the detectives or anybody at the District Attorney’s Office show you this gun before you came to testify?
“A. Yes.
“Q. So that you could identify it?
“A. Yes.
“Q. Was that Mr. Beckner ? [Assistant District Attorney who tried the instant case.]
“A. Yes.
“Q. That’s the only gun he showed you ? This is the gun Mr. Beckner showed you?
“A. Yes.
“Q. Would you say that looked like the gun this robber had?
“A. Yes.
“Q. Do you think there are any more guns that resemble that ? Or would you say this is the only gun that looks like that in the State ?
“A. Only gun look like that.
* * * # * *
“Q. This is just the gun that Mr. Beck-ner showed you?
“A. Yes.”
Herein, counsel for the defendants contends that by admitting the gun, the trial judge placed this particular weapon in the hand of the accused at the time of the crime. He submits that no gentle admonition by the Court about admissibility and weight of the evidence could effectively militate against the impact of the evidence. He argues that the fact that Jordan Anderson had a weapon when arrested did not make such weapon automatically admissible in the armed robbery trial. In effect, he says that this is what happened. Counsel further submits that in the light of the testimony offered during trial, the State not only did not prove admissibility of evidence by a preponderance, but, contrarily, categorically established no link at all between the weapon and the crime charged. Counsel relies on the case of State v. Foret, 196 La. 675, 200 So. 1, approved in State v. Coleman, 254 La. 264, 223 So.2d 402.
The Foret case was a prosecution for cattle stealing. After the prosecution and the defense had offered their evidence, the prosecution secured the consent of the trial court for the jury to view the stolen steer. A truck parked outside of the courthouse contained not only the stolen steer but also another steer. No explanation was given as to why two steers were brought to court instead of just the stolen animal. During trial, the owner of the stolen steer describ ed his animal, but no testimony was given as to the identity of the animal in the truck. This Court annulled the verdict and sentence. It stated: “The judge, in his per curiam, expresses his conclusion that ‘irrespective of impressions arising from a physical view of the steer, there was ample evidence before the jury (if accepted as true by the jury) upon which to base a verdict of guilty.’ The answer to that, of course, is that we cannot know whether the testimony in the case would have convinced the jurors without an inspection of the steer, or steers, in the truck. We cannot know the extent to which the inspection of the steer impressed the jurors, and influenced their verdict. * * * ”
In Coleman, supra, we held that the law makes no requirement that the proof be absolute or positive. A clear preponderance of the evidence on a question of admissibility, we said, is sufficient.
*315 We find that the above testimony, narrated and quoted, concerning the .38 caliber pistol satisfies the tests of preponderance and connexity. The victim, Ragu-sa, and the customer, Charleston, did not have a direct front view of the gun pointed at Ragusa. There were two robbers in Ragusa’s store when the instant offense was committed, and each had a gun; the weapon involved in this bill was allegedly used by Jordan Anderson; the description, supra, given by the witnesses to the robbery to the investigating officers placed the .32 pistol in Clyde Anderson’s hands. Officer Johnson connected the .38 caliber pistol with Jordan Anderson, and Melinda Moore unequivocally testified that the weapon offered in evidence was the gun which Jordan Anderson pointed at Ragusa during the robbery. See, State v. Davis, 259 La. 35, 249 So.2d 193.
We have read all of Melinda Moore’s testimony and find that she was an uncontradictory and intelligent witness. There was no equivocation in her testimony. The jury observed Melinda and heard her testify; it was each member’s prerogative to decide the credibility of the account of the robbery given by her.
“The sufficiency of the identification is a question of fact for the determination of the trial judge only insofar as the relevancy of the object sought to be introduced is concerned. The effect to he given to the identification and its sufficiency otherwise concerns the weight to be given to the evidence by the jury. * * * ” State v. Hills, 259 La. 436, 250 So.2d 394, 398 (1971).
“ * * * Connexity is a matter for the jury to decide, so long as the objects introduced are shown to have some relevance which the trial judge considers sufficient to warrant their introduction into evidence. State v. Stokes, 250 La. 277, 195 So.2d 267 (1967).” State v. Wright, 254 La. 521, 225 So.2d 201, 206 (1969).
We conclude that defendants’ objection to the introduction of the .38 caliber pistol in evidence went to the weight of the evidence and not to its admissibility. The facts and circumstances in the Foret case are not the same as in the instant case. Herein, the trial judge instructed the jury as follows: “Gentlemen, the Court will rule on the admissibility, but the weight to be given the evidence is within your prerogative. If the Court does admit the pistol into evidence, what weight you give it is your own decision.” It was therefore the jury’s duty to decide whether the gun offered in evidence was the one pointed at Ragusa when the instant offense was committed. See, State v. Progue, 243 La. 337, 144 So.2d 352; State v. Robertson, 258 La. 259, 246 So.2d 6; State v. McClure, 258 La. 999, 249 So.2d 109. Cf. State v. Boudoin, 257 La. 583, 243 So.2d 265; State v. Reinhardt, 229 La. 673, 86 So.2d 530; State v. Mills, 229 La. 758, 86 So.2d 895; State v. LaCoste, 256 La. 697, 237 So.2d 871.
Bill of Exceptions No. 1 is without merit.
BILL OF EXCEPTIONS NO. 2
Bill of Exceptions No. 2 was reserved when the trial judge overruled defense counsel’s objections to the offering of testimony by the State’s witnesses concerning a lineup conducted shortly after the arrest of the accused and the introduction in evidence of paraphernalia connected with such lineup.
The objections, supra, were based on the fact that the State did not mention in its opening statement that the lineup procedure would be offered as evidence.[2]
*316 Article 766, LSA-C.Cr.P., provides that, “The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.” Article 769, LSA-C.Cr. P., contains the prohibition that evidence not fairly within the scope of the opening statement of the State shall not be admitted in evidence, but it further provides that, “If the state offers evidence that was inadvertently and in good faith omitted from the opening statement, the court, in its discretion may admit the evidence if it finds that the defendant is not taken by surprise or prejudiced in the preparation of his defense.”
Herein, counsel for the defendants submits that it is an understatement to say that the defense was not taken by surprise when the State offered evidence about a lineup. It is argued that this case was decided solely upon identification evidence, and that this issue should have been resolved solely by testimony of the witnesses in court where they were subject to cross-examination. It is further argued that if lineup had been mentioned in the opening statement, counsel would have been alerted at a time which would have permitted preparation, both legal and factual, on the issue.
In State v. Stahl, 236 La. 362, 107 So. 2d 670, 672 (1959), we said: “article 333 of the Code of Criminal Procedure [replaced by Arts. 765 and 766, LSA-C.Cr.P.] requires the district attorney to make an opening statement, in which he must explain the nature of the charge and the evidence by which he expects to prove the same. In interpreting this article this court has on numerous occasions said that the article does not mean that the district attorney must give the names of his witnesses and go into minute detail as to every shred of evidence he intends to offer on the trial, but that it is sufficient if he explains the nature of the charge and the purport of the evidence by which he expects to establish the same. * * * ” See, State v. Jones, 249 La. 324, 186 So.2d 608. Cf. State v. McLean, 211 La. 413, 30 So.2d 187.
We find no merit in the instant bill, and a prolonged discussion of it is unnecessary. The District Attorney’s opening statement formed no part of the evidence, had no binding force, and was designed only to give a general acquaintance with the case which would enable the jury to understand *317 and appreciate the testimony as it fell from the lips of the witnesses. State v. Kreller, 255 La. 982, 233 So.2d 906. What the State offered in the testimony concerning the lineup was evidence; the defense at all times had the right of cross-examination and the right to ask for a continuance. We do not find that the defendants suffered prejudicial surprise constituting reversible error.
The State was exercising caution when it did not mention the lineup testimony in its opening statement. The matter was within the discretion of the trial judge, Cf. State v. Dugas, 252 La. 345, 211 So.2d 285; State v. Clark, 231 La. 807, 93 So.2d 13, and at the time of the opening statement, the State was not cognizant of what the trial judge’s ruling would be with respect to the admissibility of the lineup testimony.
Bill of Exceptions No. 2 is without merit.
BILL OF EXCEPTIONS NO. 3
Bill of Exceptions No. 3 was reserved to the overruling of an objection by defense counsel which urged that certain evidence offered during trial was tainted by the fact that certain witnesses had been shown photographs of the accused prior to the lineup and prior to the giving of their testimony.
While testifying, Officer Aaron G. Johnson, Jr. was asked to look at two pictures and tell the District Attorney their identity. The Officer indentified the pictures as those of Clyde Anderson and Jordan Anderson. The pictures were then offered in evidence by the State — State No. 1 and State No. 2.
James Oliver, an employee of Ragusa’s Grocery and Market, testified that he was working in the store when the robbers entered. After testifying concerning his observation of the robbers and stating that the smaller of the men held a gun on persons other than Mr. Ragusa, Oliver was asked, “Do you see him in the Courtroom today?” He responded, “In the Courtroom? Look something like that brown skin fellow back there.” (The fellow was not one of the defendants.) The following testimony and colloquy ensued:
“Q. Back there where?
“A. That last one settin’ over there, look something like him.
“THE COURT: Order in Court.
“Q. Now, I ask you, did you look at some pictures of some people?
“A. Yes, sir.
“Q. I ask you, did you look at this picture?
“MR. WALL: Judge, I’m going to object to any of these photographs again. I know we have had testimony on them, but I just don’t think that this has any place in the trial of this case. We’ve got the jury here, we’ve got the people supposedly involved and the witnesses, and it seems to me if they got anything to say, let them say it, based on what they are looking at it. I make an objection to that— bandying this picture around here in front of the jury.
“MR. BECKNER: Of course, Judge, he has a right — he said he looked at the pictures
“MR. WALL: Well, I just made the objection, and I ask the Judge to rule on it.
“THE COURT: I’ll let him testify.
[Bill of Exceptions reserved by Mr. Wall.]

“Q. All right, now, did you look at that that picture before?
“A. Yes, sir, I looked at it.
“Q. Did you identify that picture?
“A. That’s right, this the one. This is the one, I believe.
*318 “Q. This is one of them?
“A. That’s right, I’m quite sure that’s the picture, you know, I looked at.
“Q. And this is the one you picked out?
“A. That’s right.
“MR. BECKNER: Now, let the record show he is talking about State 1.
“Q. Now, is that the large one or the small one?
“A. That’s supposed to be the small one.
“Q. Is that the one that held the gun on Mr. Ragusa or held the gun on you ?
“A. No, that’s the one held the gun on us.
Q. Now, I ask you to look around again and see if you recognize him? Anywhere in this Court?
“A. Well, from the looks of that picture, it looks like that fellow right there. That’s the way that picture looks.
“Q. The one in the yellow sweater?
“A. Yeah, it looks like him.
“Q. And that’s the picture you identified as being the small one ?
“A. That’s the one I identified as being the small one.
“Q. And the one that held the gun on you?
“A. That’s right.”
A lineup of Jordan Anderson was held on March 11, 1970, at which time Melinda Moore identified Jordan Anderson as one of the robbers. During trial, Melinda was shown a picture and asked if “that’s the one you saw in the lineup?” She responded, “Yes.” She also identified papers which she had signed at the lineup; then just prior to her identification of the gun, supra, she identified Jordan Anderson as follows:
“Q. Do you see the person that you identified in the lineup in the Courtroom today?
“A. Yes.
“Q. Would you point him out?
“A. (Witness complied.)
“Q. The one with the brown jacket on?
“A. Yes.”
Donald W. Madison, an all around man, including delivery, for Ragusa’s Grocery and Market, made a positive in-court identification of Jordan Anderson as one of the robbers. He testified that he had attended the lineup on March 11, 1970, and had identified Jordan Anderson as one of the robbers. He also testified:
Did anybody tell you who to pick out in that lineup ? ¡O
No, sir. >
Now, did you also have an occasion to view some pictures of some people with regard to this robbery? O
Yes, sir, I did. >
“Q. Did a police officer show you these pictures ?
“A. Yes, sir, he did.
“Q. Now, did you select any picture as being a picture of one of the people involved in the robbery?
“A. Yes, sir, I did.
“Q. I show you this, marked State 1, and ask you if that’s the person you picked out?
“A. Yes, sir, it is.
“Q. Do you see that person in the Courtroom today?
“A. Yes, sir, I do.
“Q. Would you point him out to us?
“A. Setting over there in the yellow sweater.
*319 “MR. BECKNER: Let the record reflect that Clyde Anderson has a yellow sweater on and Jordan Anderson has a brown coat on, for the purpose of identification of the testimony.
“Q. Now, did anybody point to Clyde Anderson’s picture and tell you that’s the one you should pick out?
“A. No, sir.”
Counsel for the defendants argues herein that the in-court identification was possible only because of the improper use of photographs. It is submitted that photographs of the accused were shown to the witnesses in the absence of a defense attorney. It is further submitted that it was obvious that the State’s witnesses could not identify the accused from simple observation in court, and the State was permitted to let them look at photographs and then point to the accused.
In State v. Junius, 257 La. 331, 242 So.2d 533, 534 (1971), we stated: “The cited decisions do indeed hold that there may be a denial of due process of law if, judged by the totality of circumstances, the identification procedures are unnecessarily suggestive and conducive to irreparable mistaken identification — ‘so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification’, Simmons v. United States, cited above, 390 U.S. [377] at 384, 88 S.Ct. [967] at 971, 19 L.Ed.2d 1247. However, the claim of unduly prejudicial identification must in each instance be determined upon the totality of the surrounding circumstances. See also Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed. 2d 387 (1970) and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).”
We conclude that the trial judge did not abuse his discretion in overruling defense counsel’s objection to the evidence, supra. We find that under the totality of the circumstances, the pictures were shown to the witnesses for the purpose of refreshing their memories and not for the creation in their minds of a mental impression of men never before seen.
We do not find that the in-court identification was tainted by improperly suggestive pre-trial photographs or lineup procedures. The pictures of suspects shown to the witnesses during police investigation and before arrest were many in number, and the testimony attached to the bills of exceptions reflects that the witnesses were not influenced in their identifications. Therefore, we conclude that the in-court identifications were properly made and that defendants suffered no prejudice thereby. The jury saw the witnesses, observed their actions and demeanor, and heard their testimony; the credibility of the witnesses and their testimony was undoubtedly a factor considered by the jury in arriving at the instant verdicts.
Bill of Exceptions No. 3 is without merit.
BILL OF EXCEPTIONS NO. 4
Bill of Exceptions No. 4 was reserved when the trial court overruled defendants’ Motion in Arrest of Judgment which was based on the inequity of the statutes which permit nine of a twelve man jury to return a valid verdict. (The instant verdict was 10-2.)
The Motion in Arrest of Judgment averred in part:
“The offense charged is not punishable under a valid statute, in that L.R.S. 14:64, which sets out the crime of armed robbery and Article 782 of the Code of Criminal Procedure are invalid and unconstitutional for the reason that they provide for a 12 man jury, 9 of whom must concur to reach a verdict. This provision that the jury verdict need not be unanimous violates the accused’s constitutional rights as set forth in Amend *320 ments 5 and 14 of the Constitution of the United States, in that these accused have been denied the due and equal protection of the law. * * * ”
In State v. Brumfield, 254 La. 999, 229 So.2d 76, 83 (1969), we held: “Neither the United States Supreme Court nor this Court has ruled the above statute[3] unconstitutional. No further discussion is necessary; defendant’s contention has been adversely answered in State v. White, 254 La. 389, 223 So.2d 843; State v. Dunn, 254 La. 425, 223 So.2d 856.”
The reasoning of Brumfield, supra, applies to the instant bill. Until the Code of Criminal Procedure is amended or the United States Supreme Court rules contrary to Article 782, LSA-C.Cr.P., a unanimous verdict is not a mandate in a prosecution such as the instant one.
Bill of Exceptions No. 4 is without merit.
BILL OF EXCEPTIONS NO. 5
Bill of Exceptions No. 5 was reserved when the trial court overruled defendants’ Motion for a New Trial.
The bases of the Motion for a New Trial were averred errors in the trial court’s rulings on the bills of exceptions reserved during the proceedings (we have discussed, supra, the bills of exceptions with respect to these errors; no further discussion is necessary), inconsistencies and conflicts in the testimony offered by the State during trial, and evidence newly discovered since trial.
We find that the only matters raised in the Motion for a New Trial demanding our attention are those with respect to newly discovered evidence. In the Motion, counsel avers in part:
“3.
“New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendants, was not discovered before the jury trial, is available, and if the evidence had been introduced at the trial it probably would have changed the verdict or judgment of guilty.
“(A) The Court will recall the positive testimony of Donald Madison that he had seen the red car, which the robbers allegedly used, in front of the store as early as 8:45 or 9:00 in the morning. His testimony, at page 154 of the transcript, is as follows:
“ ‘A. I first noticed it around 8:45 or 9 :00 in the morning.
“ ‘Q. The same red car that you saw much later in the morning, after the robbery, was parked in front of that store at 8:30 or 9:00?
“ ‘A. Yes, sir, it was.
“ ‘Q. And these two men were either inside or standing around the car ?
“ ‘A. Yes.’
“The State had previously introduced the testimony of Leonard J. Aguillard, the owner of the red car used in the robbery. His testimony, at pages 137 and 138 of the transcript, was to the effect that his wife left for work on the morning of the robbery at about 5:30 A.M. *321 and, as far as he knew, the car was parked at Our Lady of the Lake Hospital from around 6:00 A.M. until removed therefrom by the robbers. Mr. Aguillard was contacted by the police officer around 12:30 or 1:00 P.M. about the car. So it followed that, as far as he was concerned, the car was parked around 6:00 A.M. and taken sometime prior to the officer’s talking to him. [We have read Aguillard’s testimony, which is meager, and find that counsel’s summation is correct.] It was only after the trial that the significance of the time the car was taken was a material factor in light of the review of Donald Madison’s testimony as quoted above. With this in mind, we contacted Mrs. Aguillard and attach to this motion the original of her statement taken on November 18, 1970.[4] It is noted from the statement that Mrs. Aguillard saw her car on the parking lot at Our Lady of the Lake Hospital as late as 10:30 A.M. on March 7, 1970, the date of the robbery. It is readily apparent that Clyde and Jordan Anderson were not seated in this Aguillard car or standing around this car immediately prior to the robbery at about 8:30 or 9:00 A.M. on March 7th as testified by Madison. It is obvious that Madison was lying about this most material fact and that the testimony of Mrs. Aguillard is such that it would have disproved entirely the testimony of the State’s principal witness, Donald Madison.”
In the Motion for a New Trial, counsel also averred that another witness, Calvin Johnson, whose identity was not known until after trial, had sworn by affidavit attached that he saw Jordan Anderson in his home at the time of the robbery. Counsel further averred that Patricia Williams did not appear at trial in response to her subpoena, and that her testimony was important to the case; counsel asked for time to trace her.
Herein, counsel for the defendants submits that the Motion for a New Trial, considering the case as a whole, met the requirements of LSA-C.Cr.P. Article 851.[5] *322 He says that the testimony of Mrs. Aguil-lard would probably have changed the verdict because she is a completely disinterested party whose testimony could have proved to the jury the unreliability of Donald Madison’s testimony.
In State v. Valcour, 247 La. 450, 172 So. 2d 74, 77 (1965), we said: “It is a legal requirement that a verdict must remain undisturbed unless it is made to appear, in the manner required, that an irregularity has been committed, sufficient to satisfy setting it aside. State v. Jones, supra. [112 La. 980, 36 So. 825] Under LSA-R.S. 15:511, supra, and our uniform jurisprudence, the test to be employed by the district judge in considering a motion for a new trial based on newly-discovered evidence is not simply whether another jury might bring in a different verdict — that is always a speculative matter — it is whether the new evidence is ‘so material that it ought to produce a different result than the verdict reached * * If the judge finds that the newly-discovered evidence is suspicious or incredible, then he properly exercises his discretion in denying a new trial as such evidence ought not produce a different result in the matter. State v. Bell, 242 La. 585, 137 So.2d 342. A motion for a new trial is properly refused, when based on evidence that could have, been produced at the trial by the exercise of due diligence, or on mere negative evidence that would not probably have affected the result, or on the affidavit of the accused, not corroborated by that of alleged newly-discovered witnesses. State v. Pecarino, 128 La. 269, 54 So. 794.” See, State v. Jackson, 253 La. 205, 217 So.2d 372; State v. Williams, 252 La. 1023, 215 So.2d 799.
We have read the testimony of record and, supra, narrated and quoted in great part the testimony offered by the State and that adduced by defense counsel on cross-examination. Defendants offered the testimony of some nine witnesses to the jury; these witnesses testified principally with respect to alibi. The jury heard these witnesses testify, and the verdict of ten members reflects that the State’s case prevailed.
The jury had the benefit of hearing Leonard J. Aguillard testify. He was not cross-examined. From the averments made in the Motion for a New Trial, we find that Mrs. Aguillard could have been called as a witness during trial if due diligence had been exercised. She lived and worked in Baton Rouge; her employment was in a large hospital available to the public. The Motion for a New Trial is therefore insufficient in its showing that she could not have been contacted prior to or during trial with respect to the stolen vehicle.
The averments made in the Motion for a New Trial with respect to Calvin Johnson and Patricia Williams reflect that if a new trial were granted, their testimony would be cumulative and corroborative.
Our jurisprudence is legion that the granting or refusing of motions for a new trial rests within the sound discretion of trial judges, and great reliance is placed upon them by appellate courts that they will exercise that discretion well and soundly. State v. Jackson, 253 La. 205, 217 So.2d 372; State v. Valcour, 247 La. 450, 172 So.2d 74.
We do not find that the trial judge in the instant prosecution abused his discretion *323 in overuling defendants’ Motion for a New Trial. No reversible error was committed, and defendants’ rights were not prejudiced.
Bill of Exceptions No. 5 is without merit.
For the reasons assigned, the convictions and sentences are affirmed.

. Counsel for defendants states in brief: “When defendant, Jordan Anderson, was arrested on March 11, 1970 he had a 3S cal. pistol on his person. In fact his arrest was on a disorderly charge and had nothing to do with the crime charged of armed robbery. It was this weapon which the State introduced as evidence over defense objection that the particular weapon was not identified as the weapon used in the armed robbery.”

. The following colloquy took place among counsel for the defendants, the State, and the Court:
“MR. WALL: Judge, I’ve got two objections, one being that nowhere in the opening statement was there anything about any lineup being conducted, in which they were going to seek to offer any physical evidence at all pertaining to the lineup. I don’t think the lineup was actual *316 ly mentioned in the opening statement at all, but certainly there was no delineation of any slips of paper or anything pertaining to physical evidence which might be offered by any officer. Secondly, if you call this hearsay or whatever you call it, it’s something that a witness has done and designated on a piece of paper. The best evidence of what these individual witnesses did at the time is these witnesses themselves, who can identify their signatures and state that they look at the lineup and if they did or did not view one of these people as being the accused.
“THE COURT: Do you plan on calling the witnesses?
“MR. BECKNER: Yes, sir, but I submit that I can introduce evidence of the lineup — he saw them sign the papers, he saw them write the numbers down — that’s not hearsay evidence. I’m presenting this as evidence of the lineup and it is certainly admissible in that regard.
“THE COURT: I guess it would be hearsay if you were trying to prove the truth of the identification. .
“MR. BECKNER: I’m just trying to show what the witnesses (lid in his presence.”
In the opening statement, the State said in part:
“We are going to introduce testimony that the accused, Jordan Anderson and Clyde Anderson, were subsequently identified by some of the victims of the armed robbery. We are going to show that both these accused were subsequently arrested for this offense and we are going to show that several witnesses could make a positive identification of both accused and with regard to one accused, made a positive identification by a scar on the left jaw of Jordan Anderson. We are going to show, by evidence and testimony, that one of the witnesses got an absolutely positive identification of these two accused when they came in the store the night before and the very second or minute before the robbery when the witness drove off and saw these two go into the grocery store. * * * ”

. The statute referred to is Article 782, LSA-C.Cr.P., which recites: “Cases in which the punishment may be capital shall bo tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which the punishment is necessarily at hard labor shall be tried by a jury composed of twelve jurors, nine of whom must concur to render a verdict. Cases in which the punishment may be imprisonment at hard labor, shall be tried by a jury composed of five jurors, all of whom must concur to render a verdict. Except as provided in Article 780, trial by jury may not be waived.”

. “I am Lillie Mae Aguillard, tlxe wife of Leonard Aguillard, we live at 3579 Victoria Drive, Baton Rouge, La.
“My husband, one Saturday afternoon, the exact date, I do not recall now, was advised that our car, 1964 Chevrolet, had been used, in an armed robbery at Ragu-sa’s store that date. It is my understanding that this was on March 7, 1970 that Ragusa was robbed.
“I, on March 7, 1970 was employed at Our Lady of the Lake [Hospital] and had arrived at the job at 6 A.M. I parked on the North parking lot on a slight rise or hill. I remember looking at my car in its parked position as late as 10:30 A.M. on that Saturday morning. I had looked out át it, as I was working at that end of the building. We had had several cars broken into before and I was trying to keep an eye out on the vehicle.
“I Leonard Aguillard, testified at the trial of the Anderson brothers that the car had been stolen and that all I knew was that my wife went to work for 6 A.M. I do not recall any particular discussion that my wife and I had prior to the trial as to whether it was on the lot at any particular time on that Saturday morning. My testimony was to the effect that it was parked about 6 A.M. and I was notified by the police that it had been found on Howard street. This notice to me at about 12: 12:30 P.M.
“[Sgd] Lillie Mae Aguillard
“[Sgd] Leonard J. Aguillard
“Sworn to and subscribed before me on Nov. 18, 1970.
“[Sgd] Alex Wall
“Notary Public”

. “The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
“The court, on motion of the defendant, shall grant a new trial whenever:
“(1) The verdict is contrary to the law and the evidence;
“(2) A bill of exceptions reserved during the proceedings shows prejudicial error;
“(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is avail *322 able, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
“(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise or reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
“(6) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.”