SUMMERS, Justice.
Appellant Frank Hills was indicted for aggravated rape. He was tried, found guilty without capital punishment and sentenced to life imprisonment.
Thirteen bills of exceptions were reserved, all of which are relied upon in this appeal except Bills 10, 11, and 12, these three having been abandoned.
About 3 o’clock on the morning of December 3, 1966 the prosecutrix Janice Wallace and her ten children were asleep in their home at 917 Myrtle Street in the city of Baton Rouge. The prosecutrix’s husband was away at work in Lafayette. Shortly thereafter she was awakened by a movement on her bed. She turned to face a colored male who grabbed her arm and held a metal object she believed to be a knife to her throat. He threatened her and warned her against any outcry, all the while holding the object to her throat and holding her left arm while her right arm was pinned beneath her. The assailant then raped her. When the act was consummated, the assailant left by the front door.
Immediately after his departure, the police were summoned. Investigation disclosed that the assailant entered the house through a rear unlocked window to which access was gained by a ladder.
By questioning the prosecutrix it was ascertained that a lighted gas, radiant heater was near her bed at the time of the assault. By the light of the exposed flame she saw the rapist clearly, retaining until-trial a vivid impression of his facial-features.
Sixteen days later, during the early, morning hours of December 19, a Negro man broke into a residence at 917 Napoleon Street, three blocks from the Myrtle Street address of the Wallace residence. He got into bed with a seven-year-old girl who awakened to find that the man had removed her clothing. I-Ie offered her money and threatened her ;if she cried out.
Later that morning when the child related the incident to her mother, the mother discovered muddy foot tracks on the child’s bed sheet, on the floor and at a window through which the intruder passed to enter the house. A wallet containing identification cards, papers and a driver’s license, with his picture, all belonging to appellant Frank Hills, was found near the heater in the room where the child slept. An address *441 book belonging to Frank Hills was also found near the child’s bed. These objects were delivered to the police.
Entrance into this house was gained by the intruder through the rear, and he departed from the front of the house.
Some time prior to these incidents, a Negro man entered the Biondo residence in the early morning hours about six or eight blocks away. A teenage girl who was asleep at the time was disturbed by someone pulling the covers and fondling her. She awoke to find a Negro man in her bed. He threatened that if she uttered an outcry he would kill her, and he then propositioned her offering money for her consent to sexual intercourse. Notwithstanding the threats and inducements the girl declared she would scream and the man' fled.
Investigation disclosed a window screen had been slit on the side of the house, and the front door, which had been locked, was ajar. The girl’s purse, like that of her mother and sister, had been rifled. Suitcases which had been packed for a trip to New.Orleans the next day had also been tampered with. A coat and money were missing.
Two weeks before Christmas 1966 the Biondo residence was again burglarized and a pea coat belonging to a young boy of the Biondo family was stolen. The pea coat was later found in Frank Hills’ residence.
I.
At the trial the prosecuting officer declared in his opening statement that he would present evidence of similar offenses other than the offense charged to prove system, mode of operation, guilty knowledge and intent, to which defense counsel objected. Like objection was made during the trial to the introduction of evidence of the other incidents which we have narrated — the incident of the seven-year-old child and the young Biondo girl —and the introduction of the objects found or stolen on those occasions. To preserve this issue for review, defense counsel reserved and perfected Bills 1, 2, 3, 5 and 6 which he argues on this appeal.
Intent is not an element of the crime of aggravated rape the defense contends and, therefore, error occurred when the trial judge permitted the introduction of evidence of other similar acts to prove intent. La.Crim.Code art. 42. This contention is without merit.
Criminal conduct involves acts combined with criminal intent, acts and failure to act which produce criminal consequences not requiring criminal intent and criminal negligence which produces criminal consequences. La.Crim.Code art. 7. It does not follow from these definitions, however, that intent is not relevant to criminal c.on- *443 duct producing criminal consequences where there is no requirement of specific criminal intent.
All “acts” which produce criminal consequences involve an exercise or refusal to exercise a bodily function. Action or failure to act arc external manifestations of the will of the party, unless the action or failure to act is induced by forces beyond the will of the actor. The point is made in the reporter’s comment to Article 8 of the Criminal Code as follows:
5{í % l{C %
All positive conduct includes at some point a voluntary muscular movement (external manifestations of will) which we call an act. See Restatement of the law of Torts (1934) § 2. To illustrate briefly, the muscular movement of pulling the trigger of a gun would be an “act.” The bullet’s hitting some object would be “consequences.” The act must be willed, so that if another person seized the hand of the accused and squeezed it and the trigger, or if the accused had a convulsion and lost control of his muscles, there would be no voluntary muscular movement on the part of the accused, and therefore no crime, even though someone was hit and died. However, as we know, if the act of pulling the trigger was willed by the accused and fatal consequences followed which were not willed, the accused might still be responsible, because consequences relate to intent, and one of the concepts of intent set out in the following articles might insure his responsibility.
* * * ‡ ‡ #
The intent referred to in the foregoing quotation may be either specific or general. La.Crim.Code art. 10. The intent which is pertinent here is general criminal intent which exists “when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.” It is distinguished from specific intent in that specific intent requires proof that the consequence was intended; whereas, in crimes where no specific intent is required it is only necessary to prove the “act” was intended.
Intent, therefore, is a relevant consideration in any “act” producing “criminal consequences,” even though there was no specific intent that criminal consequences would follow. “Relevant evidence is that tending to show the commission of the offense and the intent or tending to negative the commission of the offense and the intent * * La.R.S. 15:441. Thus “Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact” are admissible. La.R.S. 15:441.
Section 445 of Title 15 of the Revised Statutes declares that “In order to show *445 intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it may be inferred from the circumstances of the transaction.” This authority permits, as the trial judge ruled, the activity of this accused involving the seven-year-old girl and the Biondo teenager to be shown in order to dispel any inference that his actions with the victim Janice Wallace were not his voluntary acts — that is, similar acts were relevant to show the accused was no stranger to such actions and was, therefore, not forced into the main action, or insensible of its occurrence. In short, the similar occurrences help to establish that the “act” complained of was willed or intended. Added to this is the legal presumption which our law supports that the defendant intended the natural and probable consequences of his act. La. R.S. 15:432. Evidence to support this presumption of intent is also relevant. See La.R.S. 15:441.
In each of the incidents, including that involving Janice Wallace which is the subject of this prosecution, the assailant was a Negro man, the early morning hours were the times he chose; entry was made from a rear window and the intruder exited through a front door. In each incident he threatened the victim and offered money. All three assaults were closely related in point of time and all occurred in the same neighborhood. All occurrences were in fact similar, and from the evidence available all involved the defendant Frank Hills.
This Court has repeatedly held that in sexual offenses, such as rape, evidence of similar recent acts of the defendant is admissible to show intent. State v. Bolden, 257 La. 60, 241 So.2d 490 (1970); State v. Crook, 253 La. 961, 221 So.2d 473 (1969); State v. Ferrand, 210 La. 394, 27 So.2d 174 (1946) ; State v. Cupit, 189 La. 509, 179 So. 837 (1938); State v. Mischiro, 165 La. 705, 115 So. 909 (1928); State v. Fuller, 164 La. 718, 114 So. 606 (1927); State v. McCollough, 149 La. 1061, 90 So. 404 (1922) ; State v. Wichers, 149 La. 643, 89 So. 883 (1921); State v. DeHart, 109 La. 570, 33 So. 605 (1903).
II.
Defense counsel contends the trial judge erred in allowing the introduction of the wallet found in the seven-year-old girl’s bedroom because it could not be identified by the girl’s mother who found it. The child’s mother testified that when she found the wallet she had never seen it before. When she found the wallet she observed that it contained a driver’s license of Frank Hills. At the trial she identified the wallet with the driver’s license as the one she picked up on the morning of the assault upon her child.
The sufficiency of the identification is a question of fact for the determination of *447 the trial judge only insofar as the relevancy of the object sought to be introduced is concerned. The effect to be given to the identification and its sufficiency otherwise concerns the weight to be given to the evidence by the jury. In this case, the identification was sufficient to permit the wallet’s introduction.
III.
Defense counsel contends a bed sheet containing blood and seminal fluid purportedly taken from the bed' occupied by the seven-year-old girl on the night she was assaulted was improperly introduced into evidence. The error, it is urged, involved the prosecution’s failure to establish that the sheet was at all times in the possession of particular persons who did not tamper with it and who did not grant third persons access to the sheet. In short, a proper chain of custody was not established.
The mother testified the officers took the sheet from the bed on the morning in question. Detective Tycer verified that he was present when the sheet was removed from the bed, and he placed the sheet in an envelope which he marked in his handwriting. When he removed the sheet from the bed, he submitted it to Officer Cox, the evidence officer, who, in turn, submitted it to the crime lab. Mr. Travis Owens, a criminologist with the Louisiana ’ State Police Crime Lab, identified the sheet and the envelope, both of which bore case numbers assigned by him. While the sheet was in the laboratory he analyzed the sheet stains as blood and seminal fluid remnants.
A sufficient chain of custody was established to permit the admission of the sheet in evidence. There is no showing that the sheet was tampered with while in police custody. Only by conjecture and speculation can we sustain a contention that' third parties were granted access to the evidence or that it had been tampered with. A clear preponderance of the evidence is sufficient on a question of admissibility. Moreover, the objection is more properly addressed to the weight to be accorded to the evidence. State v. Square, 257 La. 743, 244 So.2d 200 (1971) ; State v. Coleman, 254 La. 264, 223 So.2d 402 (1969).
IV.
Detective Robert M. Tycer testified during the trial that he obtained a search warrant to search the defendant’s residence at 850 South 13th Street in the city of Baton Rouge and that neither the original nor his copies of the warrant or affidavit supporting its issue could be found. For this reason the defense objected to any testimony in connection with the search and seizure. The objection was overruled on the' basis that the search warrant and supporting affidavit were lost documents, and testimony as to their contents could be established by *449 secondary evidence. Bill 9 was reserved to this ruling.
Only Detective Tycer’s uncorroborated statement that he had obtained a search warrant and that it was lost stands to support the fact. He testified that he entered defendant’s residence with defendant’s landlord and seized a screwdriver and the pea jacket to which we have referred.
The pea jacket had previously been identified at the trial by the Biondo girl as the one taken from her residence. No motion to suppress the objects seized had been made prior to trial and no motion to suppress was made during trial. Furthermore, no argument is made in brief that defendant was unaware of the unconstitutional search and seizure until the trial was in progress. La.Code Crim.Proc. art. 703. There is serious doubt, therefore, that we should overrule the trial judge on his fact determination that a search warrant had issued and was lost. Doubt is also cast upon the validity of this bill because the pea jacket was previously identified by the Biondo girl in connection with her testimony and had been exhibited to the jury as the jacket stolen from the Biondo residence. All of these factors illustrate emphatically that the procedure prescribed by Article 703 of the Code of Criminal Procedure for suppressing evidence obtained as a result of an unconstitutional search and seizure has not been observed.[1]
*451 Despite these obvious shortcomings, seriously affecting the merits of this bill, and assuming arguendo that the search and seizure was unconstitutional, as having been made without a warrant and without permission, we are of the opinion that the ruling permitting introduction of testimony referring to the fact that the pea jacket was found in defendant’s residence was harmless error.
Our harmless error rule is embodied in Article 921 of the Code of Criminal Procedure in these terms:
A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right.
This article sets forth the basic concept of appellate review and is the primary legislative mandate governing appeals. The idea is that appeals are not granted merely to test the correctness of the trial judge’s ruling, but only to rectify an injury caused thereby. State v. Saia, 212 La. 868, 33 So.2d 665 (1948). This harmless error concept has been a legislative mandate in this State since 1928.
In 1967 the United States Supreme Court gave the doctrine added meaning when it recognized its possible application even where federal constitutional error had occurred. Mr. Justice Black writing for the majority said:
We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for “errors or defects which do not affect the substantial rights of the parties.” 28 *453 U.S.C. § 2111. None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction. (Chapman v. California, 386 U.S. 18, 21, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 [1967]).
We are of the opinion that this case presents a situation contemplated by the Court in the Chapman Case, and the error which occurred here, if any, was harmless under the rationale of Article 921 of the Code of Criminal Procedure. We are not denied the right to apply this harmless error doctrine in the face of constitutional error in the light of Chapman v. California.
The evidence to support the conviction without admitting the pea coat was overwhelming and untainted. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The strongest type of positive evidence identified defendant as the rapist of Janice Wallace. Discovery
of his driver’s license with his photograph in the seven-year-old girl’s bedroom and the other facts we have recited support a finding of overwhelming proof of guilt, the evidence concerning the pea coat being merely cumulative. Our judgment is based on our own reading of the record and on what seems to us to have been the probable impact of the seizure of the pea coat in defendant’s residence on the minds of an average jury. Harrington v. California, supra; Commonwealth v. Padgett, 428 Pa. 229, 237 A.2d 209 (1968).
The design of the exclusionary rule growing out of illegal searches and seizures since Mapp v. Ohio is to bring about a deterrent effect upon police officers who would violate the constitutional guarantees against unreasonable searches and seizures. Refusal to reverse a conviction of a defendant, because of the admission of illegally seized evidence, where other evidence conclusively demonstrates his guilt, is not going to lessen police sensitivity to the exclusionary rule, thereby reducing its deterrent effect.
This bill is without merit.
V.
Bill 13 was reserved by defendant to the trial court’s refusal to grant a mistrial. Reliance is placed upon those provisions of Article 775 of the Code of Criminal Procedure which declare that a “mistrial may be ordered, and in a jury case the jury dis *455 missed, when * * * (3) there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law. * * * ”
Thus, the argument proceeds, testimony and evidence was introduced flowing from a search and seizure, the legality of which the State failed to prove in the manner required by law. Our discussion of the search and seizure question in Part IV of this opinion and our conclusion that the error, if any, in this case was harmless disposes of this contention.
The conviction and sentence are affirmed.
DIXON, J., dissented.

. La.Code Crim.P. art. 703 :
“A. A defendant aggrieved by an unconstitutional search or seizure may move to suppress for use as evidence at the trial on the merits, any tangible objects or other property, or documents, books, papers or other writings, on the ground that they were so obtained. A motion filed under the provisions of this paragraph must be filed no later than three judicial days before the trial on the merits begins, unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion. The court in its discretion may permit the filing of such a motion to suppress at any time before or during the trial.
“B. .A defendant may move to suppress for use as evidence at the trial on the merits a written confession or written inculpatory statement, on any ground that would make it inadmissible as evidence. Such a motion to suppress must be filed no later than three judicial days before the trial on the merits begins, and shall be heard and decided by the court prior to trial.
“A ruling prior to trial on the merits, upon a motion to suppress a written confession or written inculpatory statement is binding at the trial on the merits. However, a failure to file prior to the trial on the merits a motion to suppress a written confession or written inculpatory statement does not prevent the defendant from objecting to the admissibility thereof at the trial on the merits, and a ruling made adversely to the defendant prior to the trial on the merits upon a motion to suppress a written confession or written inculpatory statement does not px-event the defendant from introducing evidence during the trial concerning the circumstances sui-rounding the making of a written confession or written inculpatox-y statement for the purpose of enabling the jui-y to determine the weight to be given to it.
“When a ruling on a motion to suppress is advex-se to the defendant, the state shall *451 be required prior to presenting the written confession or written inculpatory statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the written confession or written inculpatory statement for the purpose of enabling the jury to determine the weight to be given to it.
“C. On the trial of a motion to sup.press filed under the provisions of this article the burden of proof is on the defendant to prove the grounds of his motion, except that the state shall have the burden of proving that a purported written confession or written inculpatory statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.”